Thank you. Good morning. Miles Pope for Eduardo Valencia, and I'll try to reserve two minutes for rebuttal. The district court's decision to, quote, roll the dice on Mr. Valencia's Fifth Amendment rights, deliberately disregarding this court's published decision in United States v. Bay, and ordering Mr. Valencia to testify as a condition of displaying his hand tattoos, created a cascade of serious errors that destroyed my client's chances at a fair trial. Does our analysis here start and end with Bay? Yes. So that's it, nothing else? Nothing else needed to have been looked at except for that case? I mean, I've raised a couple of different errors below, but my or in my briefing, but my view basically is that this court's decision in Bay is very clear. It says that a person, you know, that a defendant who wishes to display his hand tattoos can display those tattoos. It's a hand tattoo case without taking the stand. Counsel, let's just assume for a moment that we agree with you that there was a constitutional error based on Bay and that error was not harmless. What is the appropriate remedy? And I think there's some disagreement between you and your friend on the other side about what this court ought to do in that circumstance. Can you can you talk to me about what not only what you think is the right remedy or what support you have for that? Yeah, absolutely. So first I would just acknowledge Bay's discussion of the correct remedy is it sort of directed a limited remand, a remand to determine basically could Mr. Bay establish foundation to display his hand tattoos. It is true that I have asked this court not to simply limit it to that particular remedy in this case. The reason for that is because in this case the Bay error led to the motion to reopen, which permitted the government to present evidence that it cast as showing that my client had perjured himself. And that, in turn, was a separate error that that that harmed my client, that my view. So essentially what you're arguing is that in Bay, the ultimate decision was for the defendant not to take the stand. So there wasn't this is factually distinguishable in the sense of whether or not because your client did take the stand. And that's where the facts depart such that a limited remand is no longer the appropriate remedy. That's exactly right. Yes, it's it's that in Bay, if the limited remand had led to the court saying, you know, you can't present your hand tattoos, you cannot lay foundation. That'd be the end of the matter. And affirming would be appropriate in this case, a limited remand. Even if the court says that we still have the separate error that you have any authority to support this argument or this position that you're taking. I understand that you're distinguishing your facts from Bay. But is there any other authority that we can look to to determine what is the appropriate disposition in this case? Well, so first to answer your question, to sort of own the fact that I don't have anything that's directly on point where I can say that's exactly the remedy that this Court has given. What I would refer to instead is just sort of general constitutional harmless error analysis. It remains the case, I think my position would be, that Mr. You know, regardless of what happens on the remand, that my client, that Mr. Valencia, was harmed, was prejudiced by the Court's Bay error and the consequences. So I would simply refer to the constitutional harmless error analysis itself. I will tell the Court candidly right now that given the Court's questions and given where we're at in terms of the where the Court is, it might make the most sense, unless again the Court has questions about any other issues, for me to reserve the rest of my time simply because I've it seems as though maybe the issue is going to be the scope of remand and I don't want to just hammer on unnecessarily. So unless the Court has questions, I will reserve the rest of my time. Thank you, counsel. Thank you so much. May it please the Court. Ian Garrix, United States. I was not trial counsel below. This Court should affirm the District Court's rulings because the District Court did not commit reversible error in requiring defendant to testify in order to show his hand tattoos because the timing of when he got those tattoos was still in question. Secondly, the District Court did not commit procedural error, reversible error by granting the government's motion to reopen. In regard to the hand tattoos, the District Court did not commit error. If the Court looks closely at Bay, the fundamental issue there was that the Court didn't allow the defendant to show his hands at all. The second half of Bay is whether or not those hand tattoos in Bay would have been relevant. And in that case, that was a witness identification case where on count one, the bank teller testified that she had seen the defendant's hands and that became relevant under 4043. And the circuit in that case only reversed on count one. On the other counts, it was not relevant and the Court remanded because there was no foundation. And the District Court here, although it may not have articulated it perfectly, the government did make a relevance objection as to the timing at ER 242 to ER 242, where the government objected when the defendant was trying to cross-examine a witness about the tattoo, the government saying whether or not he had tattoos in 2024 at the time of the trial is irrelevant to the fact of whether or not he may have had them or not at the time of the robbery four years earlier. What do you make of the record, and I understand you weren't trial counsel, but it seems to me from reading the record that the trial attorney for the government cited Bay and said that if Bay were to take the stand, he can't under the Ninth Circuit case law, wouldn't be able to ask him questions, but that he could in fact take the stand just to show his hands. So, you know, the government's own lawyer is citing Bay and the District Court ignored that. You know, it seems inconsistent for your position to be that at trial, we actually offer the court Bay and say that the defendant can take the stand without having, being questioned, but now arguing that that wouldn't have been applicable, that Bay wasn't relevant. Well, Bay was in the heat of the moment. I believe the trial prosecutor said he got an email about it. I don't think the court or the party said nobody had anticipated this issue, so nobody had really read that, maybe other than the statement that was in the first half of Bay that merely showing... In CR 366, this is the quoted language, he can just show his tattoos and I can't question him when the government brought up United States v. Bay to the District Court's attention. That's what the prosecutor said. The government understands that and the government believes that was not in full analysis of Bay because neither the prosecutor, he said he hadn't had time to read the case, nor the court had read the case. But he knew at the moment that it was non-testimonial, that that's what Bay said. Merely showing the hands. Yes. Merely showing the hands would be non-testimonial. And in terms of testifying to the date, it would be testimonial. Then it would become, when he had the tattoos, then it would become non-testimonial. And the other portion of Bay that is relevant here for these purposes is the relevance of the timing of when he had the tattoos, and that's why this court... But that only became relevant because once he was forced to take the stand and answer questions, he testified about the length of time that he had the tattoos on his hands. So had the District Court accepted the prosecutor's own statements about the limitations of Bay, there would have been no testimony of company. He wouldn't have taken the stand. He would have just showed the photo of his hands with the tattoos, which is what the defense was attempting to do in the first instance. And the court disagreed and said that, well, I think you can ask him some questions. Right. I understand that. We're here today because the court ruled the way it did. Right. But my original question to you was, how do you square the prosecutor's own statements at trial about the limitations of Bay with the argument that you're making today, which is that Bay doesn't stand for the proposition that the defendant can show his hands without taking the stand? Because in that particular discussion on Bay that they had, they didn't discuss the relevance portion of Bay, and there is still an underlying relevance issue. And the government had previously, prior to this discussion, raised the relevance objection at ER 242, and that is, the government's driving at why the district court got to where it did, because relevance was raised as the timing, and it's not relevant that you have the tattoos now to if you had them four years earlier. So the government's mentioning that, that that is why the district court had the right principle in mind, even though, because there would have to be some foundation for him to it wasn't a witness identification case. Nobody identified his hands. And he hadn't laid the foundation. He had, his girlfriend had just testified, and he didn't even ask her, Anna Ramirez, like, did he have the tattoos? Who knows why, but he could have laid the foundation. I mean, it's, the problem here is, at that point, they already had the prosecutor and the district court agreeing that the only way he could show his tattoos was if he took the stand himself. And it was never argued to the district court or by the prosecution. Well, we haven't objected to foundation, but he can lay the foundation in some way other than testifying himself, which is discussed in court.  The government's just elucidating the actual application, what bae means, because we, there are two parts to bae, the Fifth Amendment just merely showing hands and the relevance. But there was, the government never said, we understand now. We can't force him to testify, but we still have a relevance objection. We want the foundation to be laid in some other way. Not at that portion. Not at that point. That's correct. But the government would here note that the government didn't exploit any perceived error here. And even as the defense points out in their opening brief, the defense kind of harps on the government here because they didn't really cross the defendant. The government just asked a few very innocuous questions. But when the defendant went further than what the judge has said, just get up there, tell us your name and a couple other things so we can make sure the record clearly indicates who's testifying here. The judge never told him to testify as to the date of when he got the tattoos. That was defendant's choice to do that. And the government didn't even cross-examine him on that. Well, I have a little trouble because you said the whole point of why you wanted him to testify was to lay the foundation as to when he got the tattoos. Understood. There wasn't the foundation there. But the government, the point is the government didn't, the point I'm trying to make is that the government didn't cross-examine him. The government didn't go after him. The government didn't try to exploit any perceived error in him testifying. Because the court is correct saying that the prosecutor said you can just show his hands. And then when the court insisted, well, you can cross-examine him, the government really didn't do that. And that's what the defendant says. So they didn't do that after the trial. That's the whole point of the second error, alleged reopening based on impeachment. We can get there, and there's two different parts. But we're dealing with two different errors that the defense is, alleged errors that the defense is raising. So you don't think if they had gotten that Facebook information at the time of trial, they wouldn't have tried to impeach him on cross? They could have very well, if he had just shown his hands without saying anything, they could have very well, the government could have just the same in its rebuttal case, moved to reopen, or in a rebuttal case said, here are these Facebook photos uploaded before the robbery that show he didn't have tattoos either. So why did the prosecution want, insist on him testifying? Why didn't they just agree he could, all he had to do was show his hands without testifying? The prosecutor did, as the court indicated, discover bae, and then said he could testify. I'm sorry, show his hands. So without testifying. Without testifying. Without urging the court that this case dictates the result. The prosecutor cited bae for that, and then didn't, and then kind of changed course mid-trial on this. I see what you're saying, so you're saying by raising bae, the prosecutor actually backed off its position that he should be required to testify, and that it was the district court who, on its own, kept the decision. The government did everything right in this case. The government alerted the court to bae, and the government, on the motion to reopen, alerted the court to these are the factors, and in all contexts, the government did what was right. And when this perceived error of him testifying, and he testified to how long he had them, the government really kind of left it alone, is what the government would say. And that's important on harmless error analysis, because if the court finds there was constitutional error, then the party that's the beneficiary of the perceived error has to show that it's true. And if the court, in that case of Chapman v. California, and the government would encourage the court to look at that, because the court uses, Springport uses the word the beneficiary of the error. Let me ask you a question about that, because the government did stress Valencia's testimony with respect to his tattoos in their closing argument. So while I agree that the government was careful not to ask any questions, because I think they were aware of the limitations of Bay when the defendant took the stand in the first instance, in closing argument, the government then relied on that testimony and arguably exploited it to their benefit. So tell me how we get to a harmless error determination when the government did, in fact, use that testimony. Well, first, the court has to look at who's the beneficiary of the perceived error. In this case, it was the defendant, because he got up there and told everyone, I had these for nine years. He benefited from that. The government didn't benefit. So if the court looks at Chapman, it talks about the beneficiary of the perceived error. The government was not the beneficiary. But the defendant didn't want to testify. And he didn't have to. No one told him to say nine years either. I guess I'm trying to understand how you get to the harmless part when the jury, it's my understanding, even requested to hear additional information about the tattoos. Okay. So they had it, you know, top of mind. And this issue was critical to their decision, maybe. Doesn't it suggest that it was? He presented that issue to them and they considered it. So he benefited from that. In terms of harmlessness, Judge Desai, you pointed out the government kind of exploiting this. In the closing, the government would submit, that's exactly the opposite. What the prosecutor said is, you heard the agent testify and the defendant testify as to these tattoos. You're the determiner of credibility. The government did not say, he's a liar, as the defendant says in his brief. In addition, in Chapman, the Supreme Court says, in that case, the government, in machine gun-like repetition, ad nauseum, harped on this problematic evidence. This is admitted. In terms of harmlessness as well, we didn't cross really defendant on that. We could have put on the photo in rebuttal evidence anyway had he not testified. The government focused in closing and everywhere on its case, the DNA, the car, and the envelope. And that was overwhelming. The jury only deliberated two hours, which is also a consideration. But in those two hours, he requested to see the hand tattoos again. Yes, and that was helpful to defending because they wanted to see about his evidence that he was presenting, if it bared out on anything. And importantly here, the government even got up and said in closing, these photos are blurry. The agent said all along when the defense asked him when the court looks at the photo of the left hand on this desk, it's blurry. You can't really make it out. That's what the agent said all along. And the government said, well, it's blurry, so this argument is not doing anything. If we disagree with you as toward the question that Judge Desai asked, what should the remedy be here? Well, the government doesn't believe there's any reversible error, but the government did put in its brief that it's the rehearing or having another hearing to determine whether or not he could lay the foundation as set forth in Bay. What do you say to the argument that your friend on the other side made, which is that just the mere fact that in Bay where the limited remand was, the relief ultimately ordered, it came after a set of facts where the defendant never took the stand. And so that's just distinguishable at its core to the facts here, so we can't have the same limited remand in this case because ultimately Mr. Valencia took the stand, the error occurred under Bay, and so there needs to be a vacatur of the conviction. What do you say to that? Well, you're determining if it's – to determine whether or not a retrial should happen, it should be based on a hearing with new evidence. The government believes that the Bay method is the better method if that were. So the defendant here, unlike in Bay, did actually take the stand, said I've had these tattoos for nine years. What other foundation do you think would have to be laid? What would you expect to happen on the limited remand you're suggesting is necessary? If he wants to lay other foundation by other witnesses, that's just the government's position, if he wants to do that or not, and the court can make that determination, whether or not he's laid the foundation for that. Okay, well, what would happen if the foundation is laid? If he's laid the foundation, then he can show his hands. There will be a new trial. If the foundation is laid and it's relevant, if the court makes the finding that the foundation is laid and it's relevant to that point. And finally, one point on harmlessness, too, the government wasn't even allowed to impeach the defendant with his prior felony conviction. The court excluded that. And finally, the defendant had already – his tattoos were already visible in the courtroom, and he had discussed that in front of the jury, and the government would submit that the court correctly also granted the government's motion to reopen, which, over time, I can leave it at that, but we haven't gotten to that point unless the court wants to hear more. Thank you, Your Honors. Thank you. The government absolutely exploited this error in its closing argument and by moving to reopen. The motion to reopen itself, which this court has held and other courts recognize, when you move to reopen after you close, the jury will give that evidence inordinate weight, was exploiting this error. This error absolutely was not harmless. Among other things, as the court has noted, the error was mentioned – the government specifically did, and I will disagree strenuously with how the government on appeal characterizes the closing testimony. The government specifically did say, you know, you heard that Mr. Valencia during closing argument did not tell the truth, and you should consider that as relevant to the case overall. I want to just – you know, I'm sympathetic to the government's position, because the prosecutor did attempt to bring to the court's attention the fact that the defendant doesn't, under that case law, need to take the stand, and testifying could simply show his hands. And then the government didn't ask any questions on cross-examination when the defendant did offer testimony voluntarily. So what more could the government have done in this instance, where the trial court is rejecting the case law of the circuit that clearly indicates what the limitations are, and then restrained themselves from asking questions on cross-examination? What more could they have done? Well, two things. First, I am – this – even if – I am not faulting the government in terms of predicating bad faith on the prosecutor. I agree with Mr. Garrix that the prosecutor, at least when it came to bringing bay to the court's attention, did admirably. I don't really think we can read from the record or infer the prosecutor's motives from the record in terms of not asking questions. It may have been to protect his case from appeal. It may not have been. Again, I'm not saying the prosecutor acted in anything but professionally and in good faith. This is ultimately an error that the court made that affects my client's constitutional rights, and that's why the court should reverse here. But I would also say that – and again, I want to be very clear, not predicating bad faith of the prosecutor. The prosecutor, during trial, made the choice to move to reopen, made the choice to present evidence. So when I said exploited the testimony, that's what I meant. Not in a bad faith way, but simply in a he's pursuing a trial tactic. He moves to reopen. He presents evidence. What you're really talking about is whether or not the error is harmless at that point. Absolutely correct. That's exactly right. And that's why the closing argument that the prosecutor makes is relevant to harmlessness. I also want to emphasize one other thing that hasn't maybe been – I'll own it. It might have been my fault for not raising this in the briefing as well. My client lost his right to silence and the associated instruction that you were not to take my client's silence against him as a consequence of taking the stand. So all of a sudden, he takes the stand, and the jury is asking about the tattoo, but it's in considering his testimony and considering the fact that he took the stand, because he had to, but didn't say I didn't commit the robbery. That is hugely damaging. And this goes to the remand issue as well, because regardless of whether there is foundation laid for him to show his hands or not, that happened. The jury was able to think about this case in light of the fact that that right to silence instruction was not given. And that is harmful regardless of what happens on remand. And so I would urge this court to reverse. Thank you so much.
judges: SUNG, MENDOZA, DESAI